IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LEROY S. JONES,

                           Plaintiff,                             OPINION AND ORDER

     v.

                                                                19-cv-106-wmc

EMILY STADTMUELLER, NANCY WHITE,
SALAM SYED, NANCY GARCIA,
WENDY KOENIG, CAROL AL-TAHRAWY,
JESSE LANING, JOANIE SULLIVAN,
MELISSA RAMIREZ, CHAD BIRKHOLZ,
TAMI STAEHLER, TRACY THOMPSON, and
JULIE LUDWIG,

                           Defendants.

---

      Leroy Jones, who is representing himself, claims that staff at Kettle Moraine Correctional Institution ("KMCI") and Waupun Correctional Institution ("WCI") were deliberately indifferent to and negligent in treating his knee, back, and foot pain, as well as his dislocated finger. The court previously granted Jones leave to proceed against thirteen defendants on Eighth Amendment deliberate indifference and Wisconsin negligence claims. (Dkts. ##23, 29.) Defendants have since moved for summary judgment on all of Jones's claims. (Dkts. ##76, 87.) Plaintiff also filed a "Motion for Summary Judgment" seeking dismissal of defendants' motions (dkt. #97), which the court construes as his response. For the following reasons, the court will deny plaintiff's motion, grant defendants' motions as to his Eighth Amendment claims, and relinquish any supplemental jurisdiction over his remaining state-law claims.[1]

---

[1] Because of these rulings, the court need not reach defendants' alternative assertions of qualified immunity.

UNDISPUTED FACTS[2]

## I. Background

At all times relevant to this case, plaintiff Leroy Jones was in the custody of the Wisconsin Department of Corrections ("DOC") at either KMCI or WCI.  Jones suffers from chronic lower back pain and bilateral chronic knee pain, having been diagnosed with degenerative joint disease.

During the same timeframe at WCI, defendants Nancy White and Emily Stadtmueller were Health Services Unit ("HSU") Managers; Nancy Garcia was an Advanced Practitioner Nurse Provider ("APNP"); and Carol Al-Tahrawy was a Licensed Practical Nurse ("LPN"), all employed by DOC.  In addition, defendant Jesse Laning was employed by non-defendant Guardian Health, serving as an LPN at WCI.  Finally, defendant Wendy Koenig provided nursing assistance at WCI's HSU in 2016, and defendant Salam Syed was employed as a physician at Columbia Correctional Institution between 2014 and December 18, 2018.  However, during that period, Dr. Syed also practiced at other DOC institutions, including WCI, from October 16, 2016 to July 7, 2017.

Further, during the relevant period, defendant Chad Birkholz was a Correctional Officer; Tracy Thompson was an APNP; Tami Staehler was a Corrections Program Supervisor; Joanie Sullivan was a Registered Nurse; and Melissa Ramirez was a Physical

---

[2] Unless otherwise indicated, the following facts are material and undisputed, considering the parties' proposed factual findings, responses, and the evidence of record in a light most favorable to plaintiff as the non-moving party.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

Therapist, all employed by DOC.  Between September 15, 2019, and December 4, 2021, defendant Julie Ludwig also served as KMCI's HSU Manager.

In their roles as HSU Managers, defendants White, Stadtmueller and Ludwig were responsible for the overall administrative support and direction of their respective HSUs. However, HSU Managers do not evaluate, diagnose, determine a course of treatment for, prescribe medications for, or have any direct patient care responsibility for inmates; nor do they have the authority to order referrals to an outside healthcare provider.  Instead, those duties are assigned to an Advanced Care Provider ("ACP"), such as a medical doctor or an APNP.  HSU Managers also do not control an ACP's schedule or direct them to provide certain forms of care; nor do they typically see Health Services Requests ("HSRs") sent by inmates unless directed to by the triaging nurse for a particular reason.

As ACPs, defendants Syed and Garcia are responsible for professional medical services to inmates in accordance with DOC's standards of practice and community standards, as well as the policies and procedures set forth by DOC's Bureau of Health Services ("BHS").  ACPs report to and are supervised by BHS's Medical Director, rather than an HSU Manager.  In contrast, LPNs like defendants Al-Tahrawy and Laning report to and are supervised by the institution's HSU Manager.  LPNs are responsible for duties including finishing medication refills remaining from day shift, processing orders, delivering medications to cell halls, picking up HSRs, and assisting nurses as needed.  In particular, LPNs fulfill inmates' medical supply refill requests by reviewing and comparing them against the requesting inmate's DOC Patient Medication Profile ("Medical Profile Card").

3

## II.  Plaintiff's Treatment at WCI

### A. Back and Knee Pain

In June 2015, Jones saw APNP Garcia due to complaints of difficulty sitting.  Garcia assessed Jones as having acute low back pain with a pinched nerve.  To address his pain, she prescribed him Salsalate 500 mg to be taken twice a day.  At the time, Jones was already taking Gabapentin for his pain, but he complained that it made him drowsy and reported that he had stopped taking it altogether.  In response, Garcia directed Jones to only take Gabapentin at bedtime.  She also ordered an arthritis panel that came back negative, then placed an order for Physical Therapy to issue Jones a TENS unit for lower back pain, and re-evaluate and treat him.[3]  Garcia further ordered an X-ray due to Jones's report of thoracic pain, which later came back normal, asked Jones to use ice four times daily for three months, and scheduled a follow-up with her in one month for his lower back pain.  Finally, Garcia scheduled an epidural injection for Jones with non-defendant, Dr. John Choi, which occurred three months later.

Between July and September 2015, Jones received physical therapy for his lower back pain at Garcia's request.  Jones was also given exercises, which he could do himself to further alleviate his pain.  During that period, Jones reportedly continued to work in the canteen, attend recreational activities, lift weights and play basketball.  In October 2015, Jones saw Garcia again to discuss his allergies and lower back pain, at which point she

---

[3] A TENS (transcutaneous electrical nerve stimulation) unit delivers low-voltage electrical currents at or near nerves to relieve pain.  TENS units can be used to treat conditions including osteoarthritis, tendinitis, and fibromyalgia.  *Transcutaneous Electrical Nerve Stimulation (TENS)*, Cleveland Clinic (September 25, 2023), https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens.

arranged a medication refill for Salsalate, placed an order for a back brace from Physical Therapy, and directed Jones to use a muscle rub balm. Jones's Gabapentin and Salsalate orders were extended in November 2015. At no point during that period did Jones report those medications were ineffective, nor did he complete a refusal of medication form.

Later in November 2015, Jones received another epidural from Dr. Choi. Garcia placed an order to review Dr. Choi's medical report and scheduled an appointment to see Jones to discuss his subsequent treatment plan, which took place in early December. At that appointment, Jones's Salsalate prescription was refilled, Cyclobenzaprine was ordered for his muscle spasms, and an offsite consultation with a neurosurgeon was ordered to discuss alternative treatment for his back pain. During that appointment, Jones also raised complaints about his bilateral knee pain. However, because Jones's appointment was scheduled to discuss his back pain, a subsequent appointment was made to discuss his knee pain with an ACP.

On February 8, 2016, Jones signed a Refusal of Recommended Health Care form after declining to take Gabapentin. The following day, he placed an order to schedule an appointment with Garcia for a follow-up discussion about his lower back pain. On March 1, 2016, Jones was next seen by another non-defendant, Nurse Donna Larson, who assessed Jones to have impaired comfort related to musculoskeletal pain and flagged Jones's progress note for Garcia to review. The very next day, Garcia reviewed Jones's chart, noted that Jones had an upcoming neurology consult, and ordered that the relevant records be sent to the UW Health neurosurgeon who would see him. Shortly thereafter, Garcia also refilled Jones's request for muscle rub.

5

Jones saw the neurosurgeon, Dr. Kimberly Hamilton, in July 2016. Dr. Hamilton's recommendation was for Jones to continue conservative management of his lower back pain, with no activity restrictions and no follow-up scheduled. Jones continued to receive conservative care during his time at WCI, including a prescription for Pregabalin for his back pain.

On October 19, 2016, Jones saw Dr. Syed for the first time for treatment of his left knee pain, for which he administered a cortisone injection. According to Jones, he had a follow-up appointment scheduled around December 16, 2016, but Dr. Syed failed to appear. (Dkt. #104, at 38.) However, Dr. Syed did see Jones on December 20 to discuss his right knee pain. Although Jones requested an injection for his right knee and special shoes at that meeting, he did not discuss back pain with Dr. Syed at that appointment either. While Dr. Syed placed a referral with WCI's Special Needs Committee for consideration of special shoes for Jones after the December 20 appointment, he did not schedule Jones for another right knee injection because he felt it was not clinically necessary at the time.[4] Upon review of Jones's plan of care and his diagnostic imaging, Dr. Syed found no clinical correlation between Jones's reported symptoms and his physical findings, leading him to conclude that Jones's complaints were likely "somatic" in nature. (*Id*. at 41.)

Over the following months, Dr. Syed treated Jones on a few other occasions. In January 2017, he saw Jones following complaints of a dizzy spell and concerns about

---

[4] As discussed more fully below, the Special Needs Committee is a group of health services and security staff selected by an institution's warden that reviews and approves inmates' special needs and accommodations outside the norm of medical care.

seizure activity.  According to Dr. Syed, Jones did not mention his back or knee pain during that appointment, while Jones maintains that he complained about pain and Dr. Syed refused to assess or treat him for it.  (*Id*. at 43.)  While Jones later received another steroid injection in his right knee in February 2017, Dr. Syed was apparently not involved in ordering it.   In March 2017, Dr. Syed next referred Jones back to Dr. Choi for a consultation about his back pain.  Finally, Dr. Syed's last interaction with Jones was during a May 2017 visit, where Jones received treatment for a cough and itchy throat.  At that appointment, Jones also complained of lower back pain, but Dr. Syed informed him that he had already placed a referral for Jones to see Dr. Choi for his back pain.

During the 9½ month period that Dr. Syed saw Jones, he had been prescribed Flexeril, Gabapentin, Salsalate, Duloxetine, high-dosage Ibuprofen, pain injections, and muscle rub.  In Dr. Syed's clinical judgment, any stronger pain medication would have been unnecessary to treat the pain that Jones claimed to be experiencing, including, but not limited to, narcotics.  Because of Jones's history of seizures, Dr. Syed would also have been concerned that the neurological risks associated with narcotic medications would have outweighed any potential benefit Jones might experience from their use.[5]

## B.  Finger Injury

On May 18, 2016, Jones was seen at WCI's HSU to complain about finger pain. Another non-defendant, Dr. Jeffrey Manlove, assessed Jones's finger at that time,

---

[5] Although Jones also claims that he asked Dr. Syed to be allowed to take meals in his cell on various occasions during the time Dr. Syed treated him, there is no documentary evidence Jones ever did so.  (Dkt. #104, at 57-58.)  Moreover, Dr. Syed contends that there was no clinical basis for Jones to receive such an order in any event.

recommending that he use ice, ibuprofen, and "buddy tape," to align with an adjoining healthy finger, and ordered an X-ray. Jones saw Nursing Assistant Koenig the following week to discuss his X-ray results, which revealed no signs of fracture or dislocation in the finger. Accordingly, Koenig recommended that Jones continue with Dr. Manlove's plan of care and scheduled no follow-up with an ACP because: Dr. Manlove had just seen him a week earlier; there was a plan of care in place; and nothing from her examination warranted it. Moreover, Jones did not voice complaints of throbbing or aching discomfort, as he had during his consultation with Dr. Manlove, and he did not request any alternative care at this follow-up appointment with Koenig.

## C. Initial Allegations of Inadequate Healthcare at WCI

According to Jones, however, he did complain to HSU Manager Stadtmueller about the lack of treatment for his knee pain and finger pain in two, written requests sent in July 2016, then again by "contact[ing]" her the following month. (Dkt. #15, at 5-6.) While there is no record of any of those communications, Stadtmueller was copied on two letters dated July 25, 2016, from the Inmate Complaint Examiner ("ICE"), where she reported returning two inmate complaints to Jones related to the treatment for his knee and finger, respectively. The ICE instructed Jones to resolve the complaints by contacting Stadtmueller.

On August 10, 2016, Stadtmueller followed up with Jones, reviewing the extensive care he had already received for both his knee and finger, including over a dozen HSU appointments, offsite visits with Dr. Choi and a neurosurgeon, MRIs, X-rays, and prescriptions for Gabapentin, epidural injections, Salsalate, flexeril, Toradol, muscle rub,

a TENS unit, ice, back brace, and physical therapy.  Although Jones responded to Stadtmueller's letter on or about August 16, 2016, there is no evidence that she received his response.

Regardless, on September 29, 2016, Jones received his prescription for Duloxetine and a renewed prescription for a TENS unit.  For the latter to be placed on his Medical Profile Card -- and therefore, for him to receive his prescribed dosage -- Jones first needed to see Physical Therapy.  The September 29 prescriber's note for the TENS unit indicated that Physical Therapy was "to issue" the TENS unit order, but the prescriber's order also indicated that it was to be "issue[d] ASAP."  Jones's prescription for Duloxetine was discontinued on October 13, 2016.

On January 10, 2017, Jones completed a Medication/Medical Supply Refill Request for pain medication and TENS unit patches.  When Nurse Laning reviewed Jones's Medical Profile Card three days later, she returned his refill request noting that his Duloxetine prescription could not be refilled and his TENS unit or patch requests could not be completed because they had not been ordered, all in accordance with his Medical Profile Card.  Similarly, Jones alleges that in February 2017, Nurse Al-Tahrawy also ignored his request for a refill for his TENS unit.  Specifically, Jones again submitted a refill request for his TENS unit patches, as well as his prescribed muscle rub and pain medication for his knee pain.  After referencing Jones's Medication Profile card and determining that there were no active orders allowing her to refill his TENS unit or muscle rub prescriptions, however, Al-Tahrawy responded to Jones that there were no current orders for "muscle rub/pain meds (knee pain)" or "TENS unit patches[.]"  (Dkt. #104, at 50.)  The following

day, a non-defendant, Nurse Larson, presumably an APNP, resolved Jones's complaint regarding TENS patches by calling the medication room and ensuring that he received them.

Later that same month, Jones was seen again at the HSU after he reported having fallen from his top-bunk bed and injuring his lower back and right wrist. In response, Jones was given ibuprofen and a low-bunk restriction for a year. Although Jones contends that he contacted HSU Manager White immediately after the fall, who told him about the low bunk restriction, neither White or Dr. Syed, nor any other named defendant was involved in the decision to give him the restriction, which was made by WCI's Special Needs Committee. Jones also contacted HSU Manager White again in September 2017 -- stating that he suffered from a bulging disc and sciatica nerve pain and requesting care -- but by then, White no longer worked at WCI and obviously did not see or respond to his request for care.

### III. Plaintiff's Treatment at KMCI

Individuals in custody at DOC facilities, such as KMCI, are generally provided with state-issued boots or shoes to wear during their period of incarceration with three exceptions: (1) inmates can order shoes that are pre-approved by DOC from third-party vendors; (2) inmates who have a medical need for shoes that are unavailable in the vendor catalog can order custom shoes from DOC-approved companies *provided* an ACP places an order for the shoes that is then approved by the prison's Special Needs Committee; or (3) inmates can order shoes from non-DOC-approved vendors *provided* an ACP deems them medically necessary and the Special Needs Committee approves. In Jones' case, he was

10

approved to use diabetic shoes, which were designed to place less pressure on his feet and avoid needless irritation through a softer construction, between August 15, 2017 and August 15, 2018.  On May 1, 2018, the Special Needs Committee further approved a permanent order for Jones to obtain diabetic shoes with Velcro to help with his pain.  Next, in September 2018, Jones saw Dr. Choi for another epidural injection, at which time Choi further recommended that Jones use air-cushioned sole shoes.[6]

Shortly thereafter, Jones informed another non-defendant, HSU Nurse Nicole Schwaller, that Dr. Choi had given him a medical restriction allowing him to purchase personal shoes from an outside vendor with an air-cushioned sole.  At the time, because Schwaller believed that none of the shoes sold in DOC's approved vendor catalog were air-cushioned sole shoes, she asked a different non-defendant, HSU Manager William McCreedy, about how those shoes could be obtained.  However, McCreedy responded by telling Nurse Schwaller that Dr. Choi's recommendation was not binding, air cushioning was merely a "selling gimmick[,]" and Jones could instead buy insoles from an approved vendor.  (*Id*. at 68.)  Moreover, yet another non-defendant, Dr. William Kelley, Jones's primary care provider at KMCI, concurred with McCreedy.

Dr. Choi next saw Jones offsite on May 7, 2019.  He administered Jones an epidural injection and recommended an "ortho consult" for his knee pain or referral to a pain clinic for additional injections.   However, APNP Thompson did not accept Dr. Choi's

---

[6] The parties disagree over whether Dr. Choi's September 2018 recommendation for "air cushion sole-shoes" from an outside vendor had expired in September 2019 or had some binding effect after that date.  (Dkt. #104, at 71-72.)  For reasons explained below, however, any such dispute is immaterial.

recommendations, telling Jones later that month that she or another DOC advanced care provider would also need to examine him before an injection or consult could be approved by DOC.  (Dkt. #100-3, at 33.)  When Jones contacted KMCI's HSU in early June complaining of pain and seeking a solution, Nurse Thompson responded that because his pain was chronic and non-urgent, he would have to wait for an appointment just like in the "real world."  (*Id.* at 34.)  She also advised Jones to avoid activities that increased pain, wrote that Dr. Choi's recommendation was *not* an order, and noted that Choi had not examined Jones before making her recommendation.

In October 2019, Jones again saw Dr. Choi, who once more prescribed him air-cushioned soles, while noting that a substitution was permitted.  The very next day, Jones received a pair of Nike Air Max shoes from an outside vendor, which were denied by the KMCI property room on the basis that he lacked prior approval or a medical restriction. Jones then submitted a request to KMCI's Special Needs Committee for approval of the Air Max shoes.  The Special Needs Committee, which included defendants Ludwig, Sullivan, and Staehler, denied Jones's request on November 6, 2019, because he did not have an order for air-cushioned shoes from an ACP, as required by policy.[7]

When Jones further submitted an HSR in late November 2019 to request "effective treatment" for his pain, APNP Thompson informed him that he was scheduled for physical therapy and she had put in an order for his epidural injection.  (*Id.* at 35.)  Jones continued to submit additional HSRs requesting an air-cushioned shoe, but in each case, Jones was

---

[7] Although defendants Birkholz and Ramirez also served on the Special Needs Committee at the time, neither one of them was involved with or present for the denial of that request by Jones.

informed that he lacked permission to order from a non-approved vendor, and instead, could obtain them from an approved vendor catalog.  In a January 2020 letter, a non-defendant, Health Services Nursing Coordinator Lori Doehling, also told Jones that his health record did not support obtaining shoes from an outside vendor, and he could instead purchase shoes through approved vendor catalogs following security procedures, although the HSU does, on occasion, purchase shoes for inmates when medically indicated, such as in cases of severe foot deformities.

In April 2020, non-defendant, Dr. Scott Hoftiezer, next saw Jones and recommended that he use soft-soled shoes for his knee and ankle conditions, similar to the previous shoe order.  The Special Needs Committee, including defendants Sullivan, Staehler, Ramirez, and Birkholz, approved a request for diabetic Velcro shoes later in the month.  At a June 2020 consultation, Dr. Hoftiezer saw Jones again and reviewed Dr. Choi's recommendation that he be allowed the use of an air-cushioned shoe.  After further investigation, it was further determined that at least two pairs of shoes meeting this requirement could be ordered from an approved vendor catalog.  Nevertheless, Jones disagreed, saying that he needed medium-to-high top shoes for his ankle pain.  Dr. Hoftiezer agreed with Jones and investigated whether such shoes could be ordered from a vendor catalog or whether Jones needed orthotics or custom shoes made.  Jones continued to communicate with the HSU regarding his footwear needs, and in November 2020, Dr. Hoftiezer referred Jones to see a podiatrist/orthotics specialist.  After Jones saw that specialist in January 2021, he had custom shoes and inserts made and delivered to him the following month.

13

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  At summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017).  Here, plaintiff was granted leave to proceed against thirteen defendants on seven sets of Eighth Amendment deliberate indifference and state-law negligence claims. Defendants seek summary judgment on all of plaintiff's claims.  The court will address plaintiff's federal constitutional claims before turning to his state negligence claims.

## I.  Eighth Amendment Claims

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical need; and (2) a state official who was deliberately (that is, subjectively) indifferent.  *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  A medical need is "serious" if it:  so obviously requires treatment that even a lay person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and

14

suffering; *or* significantly affects an individual's daily activities. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241-42 (7th Cir. 2021); *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). Defendants do not dispute that the conditions for which plaintiff sought medical attention constituted serious medical conditions, including his allegedly severe knee, back, and ankle pain. (Dkt. #77, at 21 and Dkt. #88, at 4.)

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it, which is a decidedly high standard by itself. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference require more than negligence, or even gross negligence, but require something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994). The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; or (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id.* at 837.

In the medical context, deliberate indifference may be inferred when the defendant's conduct is "blatantly inappropriate," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In other words, "[a] constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotations omitted). Thus, a plaintiff asserting

15

a medical-care claim under the Eighth Amendment must prove four things: (1) the prisoner needed medical treatment; (2) the defendant knew that the prisoner needed medical treatment; (3) the defendant consciously refused to take reasonable steps to provide the needed treatment; and (4) the defendant's action or inaction harmed the plaintiff. *Federal Civil Jury Instructions of the Seventh Circuit* § 7.17 (2017); *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

To prevail on his deliberate indifference claims, plaintiff must also show that each defendant's personal actions caused his injury. *Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("[T]he ordinary rules of tort causation apply to constitutional tort suits."). Causation is normally a question for the jury to decide. *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010) ("only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation"). Thus, plaintiff must show how each of the defendants was *personally* involved in depriving him of or delaying his necessary treatment. *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012). Moreover, a defendant cannot be held liable under the Eighth Amendment "if the remedial step was not within [his or her] power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). The court analyzes plaintiff's claims and proof for each defendant or groups of defendants under these requirements below.

16

## A.  APNP Garcia

Plaintiff claims that defendant Garcia was deliberately indifferent to his back and knee pain by (1) prescribing him muscle balm, which he describes as having been ineffective, after her December 2, 2015 consultation and (2) advising him to continue using Gabapentin, Salsalate, and muscle balm at her March 2, 2016 consultation, despite knowing that they were ineffective.  Plaintiff further claims Garcia knew he was not taking pain medications that he believed to be ineffective, yet prescribed them anyway.

A prison official's decision to persist in a course of treatment known to be ineffective may constitute a departure from minimally competent judgment.  *Petties*, 836 F.3d at 729. However, the Eighth Amendment does not give a prisoner the right to specific treatment or a medical provider of his choosing on demand.  *Id.* at 730.  Although plaintiff did formally refuse to take his prescribed Gabapentin in February 2016, after telling Garcia that it was not effective for several months, he has submitted *no* evidence suggesting that Garcia's treatment decisions were inappropriate under the totality of the circumstances. Specifically, Garcia did not limit plaintiff's treatment to a single, potentially ineffective medication.  Instead, the evidence shows that Garcia ordered a wide range of other treatments for his back pain between June 2015 and March 2016, including pain medications -- such as Salsalate and Cyclobenzaprine -- physical therapy, a back brace, and a TENS unit.  Garcia also referred plaintiff for epidural injections and a consultation with a neurosurgeon.  Moreover, despite alleging that his prescribed muscle balm was ineffective, plaintiff requested -- and received -- refills of it in both 2016 and 2017.  Finally, the record

shows that Garcia provided plaintiff with a broad range of medications and alternative treatment options besides Gabapentin to address his back pain.

Similarly, plaintiff has presented no evidence from which a reasonable jury could find that Garcia was deliberately indifferent to his knee pain.  Instead, he contends that in a November 2015 HSR, he complained of knee pain, which Garcia chose to ignore during their meeting in December 2015.  (Dkt. #104, at 25.)  First, the HSR does not actually reference knee pain (dkt. #100, at 27), and there is no evidence that Garcia ever actually saw this HSR.  Second, during her December consult, Garcia placed an order that would allow plaintiff to discuss his knee pain with an ACP, which he proceeded to do at various times in 2016 and 2017.

Finally, Garcia is entitled to considerable deference with respect to her decisions involving pain medications in an institutional setting, even when another doctor prescribed it.  *E.g.*, *Burton v. Downey*, 805 F.3d 776, 785-86 (7th Cir. 2015) (doctor's refusal to prescribe narcotic did not violate detainee's constitutional rights despite another doctor's prescription for it); *see also Snipes*, 95 F.3d at 592 ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations").  Because no reasonable jury could conclude that Garcia was deliberately indifferent to plaintiff's complaints of back or knee pain, she is entitled to summary judgment on plaintiff's Eighth Amendment claim against her.

### B. Nursing Assistant Koenig

Plaintiff also claims that defendant Koenig acted with deliberate indifference to his

18

finger injury when treating him at a May 24, 2016 follow-up visit, where she noted swelling and pain in his finger, but failed to splint his finger, provide any other pain relief, or schedule him for a future assessment by an ACP.  However, Koenig's role in plaintiff's treatment was limited to a single consultation, where she advised him that x-rays showed his finger was not fractured or dislocated, and that his established treatment protocol for a sprain was already in progress and showing results.

    In some cases, waiting several days to treat an injured finger can constitute deliberate indifference.  *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007).  However, unlike the inmate in *Edwards*, who was "forced to wait two days for proper treatment . . . with a dislocated and fractured bone sticking through the skin and exposed" because his treating physician "did not want to be bothered during his New Year celebrations[,]" *id.*, plaintiff cannot and does not dispute that he was receiving care for his finger, even if he continued to experience some pain.   Further, medical professionals are "entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'"  *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).  Here, plaintiff cannot point to any reason why Koenig would have needed to order a referral to an ACP or provide any other care for his finger, and no reasonable jury could conclude that she was deliberately indifferent by declining to do so, when his existing treatment was determined by an ACP, there appeared to be no change in available information during her consult (other than ruling out a break or dislocation) just a week after Jones was seen by that ACP, and the ACP's prescribed treatment was displaying positive results.

19

Consequently, defendant Koenig is also entitled to summary judgment on plaintiff's Eighth Amendment claim against her.

### C. WCI's HSU Managers Stadtmueller and White

Plaintiff's next set of claims involves allegations that defendants Stadtmueller and White were deliberately indifferent to his pain by ignoring complaints that he was not receiving proper treatment.  In particular, plaintiff alleges that Stadtmueller disregarded complaints that his knee was not being treated in July and August of 2016, as well as failed to arrange for him to be seen in connection with ongoing and unresolved pain.  Further, as to White, plaintiff contends she (1) failed to address Dr. Syed's inadequate treatment in December 2016 and January 2017, and (2) did not take corrective actions in September 2017 with respect to Dr. Syed's failure to provide adequate pain medication, injections, and a low bunk reinstatement.  However, the evidence fails to support any of these contentions.

The crux of plaintiff's argument regarding both defendants is that by not addressing his complaints, they failed to adhere to relevant DOC policies regarding inmate medical care.  (Dkt. #98, at 5.)  Relatedly, he claims -- with no supporting evidence -- that White and Stadtmueller "are in fact determining . . . or overriding physicians['] or specialists['] decision[s]."  (Dkt. #104, at 14.)   Although plaintiff describes a series of detailed complaints that he attempted to refer to Stadtmueller between May and October 2016, as well as to White between December 2016 and January 2017, he concedes that as HSU Managers, White's and Stadtmueller's role in any individual inmate's care is "very limited." (Dkt. #98, at 4-5 and Dkt. #104, at 17, 59.)  Furthermore, there is no dispute that White

stopped working at WCI by the time plaintiff attempted to contact her directly in September 2017.  Nevertheless, he contends that defendants White and Stadtmueller should have ensured that he was seen in a "timely manner" and received the treatments he requested, "such as a five[-]minute steroid injection, a temporary feed in cell, or a splint for his dislocated finger."

The claims against defendants Stadtmueller and White fail for three separate reasons.  *First*, violation of a prison policy alone "does not violate the Constitution or suggest deliberate indifference."  *Schroeder v. Sawall*, 747 Fed. App'x 429, 431 (7th Cir. 2019) (citing *Lewis v. Richards*, 107 F.3d 549, 553 n.5 (7th Cir. 1997); *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996)).  Regardless, plaintiff does not explicitly advance a claim based on respondeat superior liability, and any alleged failure of HSU staff members managed by Stadtmueller and White to abide by those policies does not support a finding of deliberate indifference on their part.  *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("no prisoner is entitled to insist that one employee do another's job").

*Second*, plaintiff is not a medical professional, so he "is not competent to diagnose himself, and he has no right to choose his own treatment."  *Lloyd v. Moats*, 721 Fed. App'x 490, 495 (7th Cir. 2017).  Simply because plaintiff would have preferred to receive additional steroid injections, feed-in-cell privileges, or a splint for his finger does not mean that a failure to receive them constitutes deliberate indifference, much less that either HSU Manager was in a position to second-guess Dr. Syed's or another direct provider's medical judgment.

*Third*, and most importantly, neither Stadtmueller nor White can be held liable under the Eighth Amendment "if the remedial step was not within [her] power." *Miller*, 698 F.3d at 962.  Again, as HSU Managers, neither While to Stadtmueller had any role in directly treating patients, ordering care, or prescribing medications.  (Dkt. #104, at 11-14.)  Even if the trier of fact could assume that defendants Stadtmueller and White overrode certain medical decisions made by other DOC doctors and nurses -- again, a theory that plaintiff advances without any supporting evidence -- the fact that another medical provider reached a different conclusion about what treatment to provide plaintiff is not, on its own, evidence of deliberate indifference.  *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Taken together, no reasonable jury could find that defendants Stadtmueller or White were deliberately indifferent to plaintiff's medical needs, particularly when (1) Jones was already receiving direct care for the conditions he complained about and (2) they lacked the authority to override or take other remedial action in the absence of manifest indifference by others.  Accordingly, summary judgment will be entered as to plaintiff's Eighth Amendment claims against them as well.

### D. LPNs Al-Tahrawy and Laning

Plaintiff also alleges that defendants Al-Tahrawy and Laning were deliberately indifferent to his medical condition in January and February 2017 by (1) not dispensing his TENS unit, unit patches, and pain medication and (2) failing to verify any existing orders for medical items before declining to dispense them.  In response, Al-Tahrawy and Laning argue that they lacked authority to issue medications that had not been placed on

a patient's Medical Profile Card and could only refill prescriptions that had been approved. In particular, because plaintiff failed to obtain an order for his TENS unit from Physical Therapy, as would be required for that prescription to be placed on his Medical Profile Card, and because his Duloxetine and muscle rub prescriptions had expired or were non-refillable, respectively, defendants contend they lacked any authority to act.  Plaintiff does not dispute that LPNs fulfilled medical supply requests by referencing the patient's Medical Profile Card; instead, he claims that Al-Tahrawy and Laning should have searched the "Prescriber's Orders" section of his inmate medical file where "all orders must be documented before being placed on an inmate's medication profile card."  (Dkt. #98, at 7-8.)

As a general rule, nurses can defer to the treatment decisions of ACPs, as long as those decisions are not obviously problematic.  *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012).  However, in this case, Al-Tahrawy and Laning were not even exercising medical judgment, nor could they in their roles as LPNs.  At bottom, plaintiff contends that Al-Tahrawy and Laning were deliberately indifferent towards his medical needs because they did not provide him with medications that they were not authorized to dispense.  Again, because "the remedial step was not within [their] power," *Miller*, 698 F.3d at 962, Al-Tahrawy and Laning could not have been deliberately indifferent to plaintiff's medical needs.  Finally, even if either defendant could be found negligent or even grossly negligent for not inquiring further about the intent of advanced medical providers with respect to plaintiff's apparent discontinued treatment, that is not

23

actionable under the Eighth Amendment.  Therefore, they are also entitled to summary judgment on those claims against them.

### E.  Dr. Syed

Plaintiff next claims that defendant Syed was deliberately indifferent to his back and knee pain by:  (1) cancelling an appointment in December 2016 without notice; (2) refusing to examine him when they did meet later that month; and (3) refusing to provide effective pain medications, reinstate his low bunk restriction, or give him a designation that would have allowed him to take meals in his cell until he could be treated and walk without severe pain.  Plaintiff also contends that Dr. Syed's failure to provide him with appropriate medical treatment may have led to his fall from a top-bunk bed in February 2017.  Unfortunately, the evidence is insufficient for a reasonable jury to find for plaintiff as to any of these claimed acts of deliberate indifference.

*First*, Dr. Syed's alleged cancellation of his December 16, 2016 appointment with plaintiff -- or at minimum, a failure to appear for it -- may evince a lack of respect for plaintiff's time, but it does not rise to the level of deliberate indifference.  Certainly, an "inexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily prolongs suffering can show deliberate indifference.  *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quotation marks omitted).  "[E]ven brief, unexplained delays in treatment may constitute deliberate indifference."  *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quotation marks omitted).  However, in circumstances where medical care is delayed, the Seventh Circuit has "required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."  *Walker v.*

24

*Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)); *Petties*, 836 F.3d at 730-31 (a delay in treatment only constitutes deliberate indifference where a plaintiff presents independent evidence that the delay exacerbated an injury). Here, it is undisputed that Dr. Syed saw plaintiff within four days of their cancelled first appointment, and plaintiff has not pointed to any evidence suggesting that this brief delay in being seen aggravated his existing conditions. As a result, no reasonable jury could find that allegation rises to the level of deliberate indifference.

*Second*, plaintiff claims that Dr. Syed refused to examine him when they met on December 20, 2016. However, the undisputed evidence shows that they met to discuss his right knee pain, and plaintiff requested an epidural injection for his right knee and special shoes. While Dr. Syed did not schedule plaintiff for a right knee injection, this was based on his considered medical judgment that it was not clinically necessary at the time. Further, there is no dispute that Dr. Syed subsequently placed a referral with WCI's Special Needs Committee for consideration of special shoes for Jones. Taken together, therefore, plaintiff's complaint about the December 20, 2016 visit boils down to his allegation that Dr. Syed did not discuss his back pain with him or schedule him for an immediate right knee injection. However, neither claim rises to the level of deliberate indifference. With respect to the former, Dr. Syed had referred plaintiff to Dr. Choi for a consultation about his back pain by March 2017. As to the latter, because Dr. Syed's decision not to schedule plaintiff for a right knee injection was grounded in his professional judgment, he is "entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain*, 512 F.3d at 894-95. Although

plaintiff did ultimately receive a steroid injection in his right knee in February 2017 without Dr. Syed's involvement, there is no evidence from which a reasonable jury could find that Dr. Syed's exercise of judgment to withhold it at least two months before ran afoul of minimally competent medical reasoning.

*Third*, Dr. Syed's refusal to provide effective pain medications, reinstate plaintiff's low bunk restriction, or give him a feed-in-cell designation during their other appointments are not indicative of deliberate indifference, particularly when viewed against the broader background of his medical care at WCI.  When Dr. Syed first saw plaintiff in January 2017 for complaints about a dizzy spell and concerns about seizure activity, he refused to prescribe any stronger painkillers, again based on his medical judgment, including, but not limited to, narcotics.  That decision, particularly in the context of pain medication, is entitled to significant deference.  *Burton*, 805 F.3d at 785-86.  Although the parties disagree over whether they discussed plaintiff's back or knee pain during that appointment, the record plainly shows that:  (1) plaintiff received an epidural injection for his right knee the next month; (2) he was already receiving an extensive set of pain medications; and (3) Dr. Syed himself referred plaintiff out to Dr. Choi for a consultation about his back pain within the next two months.  Finally, Dr. Syed's last interaction with plaintiff was during a May 2017 visit where plaintiff complained of a cough and itchy throat, for which he was treated. At that appointment, in response to plaintiff's complaint of lower back pain, Dr. Syed also informed him that he had already placed a referral for plaintiff to see Dr. Choi.

Although plaintiff contends that Dr. Syed was deliberately indifferent to his medical needs by refusing to reinstate his low bunk restriction or give him a feed-in-cell designation,

plaintiff is not competent to choose his own treatment, *Lloyd*, 721 Fed. App'x at 495, and it is undisputed that Dr. Syed lacked the ability to do either on his own without approval from the Special Needs Committee.  At any rate, plaintiff ultimately received a low bunk restriction in February 2017 (dkt. #104, at 55), and he concedes that there was no clinical basis to order bed rest or confinement to his cell based on the impact that physical <u>in</u>activity would have on his knee and back pain.  (*Id*. at 58.)  As a result, no reasonable jury could find that Dr. Syed was deliberately indifferent to plaintiff's medical needs in connection with his desired cell conditions either.

Finally, plaintiff's contention that Dr. Syed's claimed failure to provide him with appropriate medical treatment led to his February 2017 fall from a top-bunk bed is purely speculative and cannot create a genuine issue of material fact that would defeat Dr. Syed's motion for summary judgment.  *Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011).  Because plaintiff cannot prevail on his Eighth Amendment claims against Dr. Syed, summary judgment must also be entered in his favor.

## F.  Special Needs Committee Members Ludwig, Sullivan, Staehler, Birkholz, and Ramirez

Plaintiff further claims that defendants Ludwig, Sullivan, Staehler, Birkholz, and Ramirez were deliberately indifferent to his need for air-cushioned shoes to address chronic pain and degenerative knee disease by virtue of their service on KMCI's Special Needs Committee, which refused to accept Dr. Choi's October 2019 recommendation that he receive such footwear.  Specifically, he claims that:  (1) defendants Ludwig, Sullivan, and Staehler were deliberately indifferent to his pain when they denied him a restriction

renewal allowing him to wear the Air Max shoes in November 2019; and (2) defendants Sullivan, Staehler, Ramirez, and Birkholz were deliberately indifferent to his pain when they "altered" Dr. Hoftiezer's order for air cushioned shoes from an outside vendor in April 2020, leading him to experience unnecessary pain and suffering.  (Dkt. #98, at 8.)

The starting point in evaluating the SNC's decisions in November 2019 and April 2020 is the existing recommendations of plaintiff's medical providers.  To begin, there is no reasonable dispute that by November 2019, Dr. Choi had recommended -- and later prescribed -- air-cushioned shoes for plaintiff on two separate occasions.  However, neither the Special Needs Committee's decision nor any other evidence of record indicates that in denying plaintiff's shoe request, defendants Ludwig, Staehler, or Sullivan, as members of the Special Needs Committee, actually considered Dr. Choi's recommendation or prescription.  Instead, the one-page SNC decision form simply includes a statement that plaintiff did not meet the criteria for the request.  (Dkt. #33-3, at 1.)  Moreover, a subsequent note from Sullivan to plaintiff states that his requested shoes "d[id] not meet security standards."  (Dkt. #85-1, at 120.)  Further, in her declaration, Ludwig contends that the Special Needs Committee "felt the request was not in compliance with [DOC] policy" at the time it received plaintiff's request, which would have required adoption by an ACP *at KMCI*, not just an outside provider, for the committee to approve it.  (Dkt. #85, at 9-10.)  She also states that the "prior order" from Dr. Choi expired on September 24, 2019.  (*Id*.)  While plaintiff disagrees, contending that "nothing in this previous order . . . indicates that [Dr. Choi's] approval was only for one year," (dkt. #104, at 71), this supports a finding of negligence, not deliberate indifference.

28

In fairness, Ludwig's post-hoc conclusion does not, on its own, justify the Special Needs Committee's denial of plaintiff's request, but it does demonstrate that plaintiff's case is not one where the committee's decision went against the recommendations of one or more doctors *at the inmate's institution*. *E.g., Brooks v. Hoffman*, No. 20-cv-05-wmc, 2023 WL 5929770, at *8-9 (W.D. Wis. Sept. 12, 2023).  To the contrary, after Dr. Choi's first recommendation that plaintiff use air-cushioned shoes in 2018, *two* non-defendant medical providers at KMCI dismissed air cushions as a "selling gimmick."  (Dkt. #104, at 68.) Regardless, disagreement between two medical professionals, without more, does not establish an Eighth Amendment violation.  *Pyles*, 771 F.3d at 409.  So that even if Dr. Choi's recommendation had not expired, as plaintiff contends, it did not bind the Special Needs Committee nor was it representative of a broader medical consensus regarding plaintiff's needs.

Plaintiff separately points to cases holding that deliberate indifference can be inferred by a provider's failure to provide care that was recommended by a specialist, particularly when done so for a non-medical reason.  *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018); *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018).  However, neither doctors nor other physicians are *required* to follow a specialist's recommendation when another, viable alternative existed.  *Wilson*, 901 F.3d at 822; *Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.").  Cases where a prison medical provider's failure to follow a specialist's advice amounted to deliberate indifference tend to involve far more severe allegations of injury or uncontroverted professional opinion.

29

*E.g., Arnett*, 658 F.3d at 753-54 (prison medical personnel took ten months to obtain prescribed anti-inflammatory for inmate's rheumatoid arthritis where need was undisputed); *Perez v. Fenoglio*, 792 F.3d 768, 777-79 (7th Cir. 2015) (prison doctor refused to follow specialists' recommendations that inmate receive surgery for "gaping wound" in hand and "open dislocation" of thumb).

Based on the undisputed facts in this record, in contrast, a jury could not find that defendants Ludwig's and Sullivan's conduct as medical professionals on the November 2019 Special Needs Committee was "blatantly inappropriate," *Snipes*, 95 F.3d at 592, or went "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396.  Nor was there any reason for Staehler, as the sole non-medical member of the November 2019 Special Needs Committee, to believe that "prison doctors or their assistants [were] mistreating (or not treating) a prisoner," such that she could be found deliberately indifferent to plaintiff's medical needs.  *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (citations omitted).

There is even less evidence to support plaintiff's contention that the actions of the April 2020 Special Needs Committee amounted to deliberate indifference.  Indeed, that committee -- comprised of defendants Sullivan, Staehler, Ramirez, and Birkholz -- *granted* plaintiff's request for diabetic shoes.  (Dkt. #33-3, at 2.)  Nevertheless, plaintiff contends that the committee "alter[ed]" Dr. Hoftiezer's order and gave him "diabetic velcros" consistent with his permanent order for the same, rather than the air-cushioned shoes whose order was believed to have expired in September 2019, which presumably is a reference to an order from Dr. Choi.  (Dkt. #98, at 8.)  However, the relevant medical

30

records show that Dr. Hoftiezer ordered "a soft soled shoe similar to his previous shoe order" (dkt. #85-1, at 84), which is susceptible to reasonable deference to the Special Needs Committee's reading.  Even if the court accepts plaintiff's version of the evidence, as it must at summary judgment, without any evidence for a reasonable jury to infer that the April 2020 Special Needs Committee *intentionally* altered or ignored Dr. Hoftiezer's recommendation -- plus, the undisputed fact that it ultimately granted plaintiff's request for soft shoes, even if they were not the exact ones he wanted -- a reasonable jury could not find that defendants Sullivan, Staehler, Ramirez, and Birkholz acted with deliberate indifference to plaintiff's medical needs.

### G. APNP Thompson

Finally, plaintiff contends that defendant Thompson was deliberately indifferent to his medical needs when she "denied, delayed, and interfered with treatment recommendations" from two non-defendant physicians -- Drs. Kelley and Choi -- between April and November 2019.  Specifically, plaintiff points to:  (1) Thompson's refusal to refer him to a specialist in May and June 2019, despite Dr. Choi's recommendations that he be seen by one; and (2) Thompson's decision to place Jones on a list to see Dr. Hoftiezer for possible knee injections in November 2019.  As a result, plaintiff argues that his knee and foot pain was left untreated.

Plaintiff's claims against Thompson present a closer question, which are not assisted by defendants' briefing only glancingly addressing Thompson's conduct.  However, based on the actual evidence in the record, a reasonable jury could not find that that she was deliberately indifferent to plaintiff's medical needs.  First, even if Thompson did not accept

Dr. Choi's suggestion that plaintiff see a specialist in May and June 2019 -- noting instead that she or another DOC provider would need to examine him first -- again, such a disagreement between two medical professionals does *not* establish an Eighth Amendment violation on its own. *Pyles*, 771 F.3d at 409. Second, when plaintiff contacted the HSU in November 2019 seeking "effective treatment," Thompson informed him that she had scheduled him for a follow-up with Dr. Hoftiezer to discuss possible steroid injections. (Dkt. #100-3, at 35.) Moreover, plaintiff remained on an extensive regimen of pain medication and steroid injections as needed until he actually saw Dr. Hoftiezer less than five months later, setting in motion the process that led to his receipt of custom shoes and inserts by January 2021. When viewed against this broader backdrop of plaintiff's overall care plan, Thompson's actions were not "blatantly inappropriate." *Snipes*, 95 F.3d at 592; *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000). As a result, Thompson is also entitled to summary judgment on plaintiff's Eighth Amendment claims against her.

## II. Exercise of Supplemental Jurisdiction over Plaintiff's State-Law Negligence Claims

That leaves plaintiff's state-law negligence claims against all thirteen defendants. While the court may exercise supplemental jurisdiction over these claims, 28 U.S.C. §1367(a), the court will decline to do so here because plaintiff's related federal claims against these defendants are being dismissed before trial, and as explained above, the court has not considered the merits of those state-law claims under a different evidentiary standard. 28 U.S.C. § 1367(c)(3). In deciding whether to exercise supplemental jurisdiction, a federal court "should consider and weigh in each case, and at every stage of

the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Here, exercising jurisdiction over plaintiff's state-law claims does not serve judicial efficiency, nor have the parties asked the court to retain jurisdiction over them if the federal claims are dismissed.  Accordingly, plaintiff's state-law claims will be dismissed without prejudice to him pursuing them in Wisconsin state court, subject to any applicable statute of limitations.

## ORDER

IT IS ORDERED that:

1) Defendants' motions for summary judgment (dkt. #76 and dkt. #87) are GRANTED and judgment shall be entered against plaintiff Jones on his Eighth Amendment claims.

2) Plaintiff's "Motion for Summary Judgment" (dkt. #97) is DENIED.

3) The court relinquishes jurisdiction over plaintiff's state-law claims against defendants Stadtmueller, White, Syed, Garcia, Koenig, Al-Tahrawy, Laning, Sullivan, Ramirez, Birkholz, Staehler, Thompson, and Ludwig, which are dismissed without prejudice.

4) The clerk of court is directed to enter final judgment accordingly and close this case.

Entered this 7th day of March, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge